Dissenting Opinion.
Watkins, J.
The plaintiff instituted this suit in her own right as the surviving widow of Edward Hoelzel, and also in the capacity of natural tutrix of the children of her marriage with the deceased, for recovery from the defendant of the sum of ten thousand dollars as •damages occasioned by the death of her said husband through the gross carelessness and negligence of its agents and servants— depriving them of a support and maintenance.
The defence is contributory negligence.
*1308 The case was tried by the judge, who found for the plaintiff the full amount claimed, and the defendant appealed.
The judge a quo prepared his reasons for judgment in writing and they are not only incorporated in the transcript, but they are reproduced in the brief of plaintiff’s counsel in extenso; and as the salient facts are brought forward in clear and concise form, I have taken the liberty of making the following extracts therefrom,, namely:
“The substantial facts are as follows:
“ The defendants own and operate a line of electric cars in this city, known as the Judah Hart line. It runs from Canal street to Carrollton. On Louisiana avenue it has a double track, one track for the cars going down on the lower side of the neutral ground in. the centre of Louisiana avenue, between Baronne and Frered streets, and the other track for the cars going up to Carrollton on the upper side of the neutral ground, between Dryades and Howard streets, Between these tracks is a single track of the Illinois Central Railroad, a stpam railroad.
“ Between Baronne and Freret, and between Dryades and Howard, and especially on the lower side of Louisiana avenue, between Franklin and Liberty streets, there are no banquettes. This part of the city has been settled in the past five or six years. When a building was erected the owner would raise the banquette in front and lay a plank walk over the gutter and across the street to the neutral ground. To reach their home, all the residents in that neighborhood were in the habit of walking on the neutral ground, on or between the tracks, until they were opposite their homes, when they would cross over on their plank walks. The same course was pursued in leaving their homes. They were compelled to adopt this mode and custom because the ground where a banquette should have been was low and muddy, the gutters wide and deep and walking inconvenient, if not practically impossible. This custom was well known to the employees of the railroad company, for there was a well beaten path between the Illinois Central track and the track of the defendant company, the plank walks were visible and people were frequently seen walking on the neutral ground, passing up and down and crossing over to their homes.
“ John Hoelzel lived with his family on the lower side of Louisiana avenue, between Franklin and Liberty streets, about the centre of *1309 the block, in a small cottage owned by him. In front of his cottage he had raised the banquette, and laid a plank walk from the banquette to the neutral ground in the manner described. There was no banquette on either side of him to the corner of either Franklin or Liberty streets. There was a bad, muddy place next to him toward Franklin street, and the weeds were very high and he and his family were compelled to use the plank walk and neutral ground for ingress and egress.
" They had been in the habit of doing so for three years. It was their habit before the road was built and after.
“ On the night of April 13, 1895, John Hoelzel was returning to his home from a barber shop. He met witness, Emile Gearhart, on the neutral ground on Louisiana avenue corner of Franklin. He was then half a block from his residence. They conversed five or ten minutes standing on the track of the I. 0. Railroad, and then Hoel-zel walked toward his home, toward the woods.
“ The witness walked toward the river. Gearhart had hardly walked twenty feet when an electric car, going down town, passed him at a very rapid speed. Its headlight was dim. He walked about twenty feet further, when the car stopped. He then walked back to the car and found that Hoelzel had been ruu over, horribly mangled, killed by the car,- in front of the plank walk leading to his residence. The motorman did not sound his gong at the crossing or before he struck Hoelzel.
“ Another witness, Martin, tried to stop the car a block and a half away from where the accident happened, with the intention of going •down town. He stood on the track and waved to the motorman, but the car was going so fast it was impossible to stop it, and the .headlight so dim that the motorman could not or did not see him, and he had to step aside and let the car go by. He heard no gong sound from the time the car passed him until it struck Hoelzel and stopped. Martin then walked to the car in about five minutes.
“ Other witnesses testified that the car was running at a very vapid speed, and one other that no gong sounded. The car ran from forty to fifty feet beyond the spot where Hoelzel was struck before it stopped.
“ The motorman saw Hoelzel walking between the Illinois Central Railroad Company’s track and Traction Company’s track. His back was to the approaching car. He was right near to the line of the *1310 car, and the motorman says that he saw he was in danger from where he was. The motorman saw him when he was within fifteen i feet of him.
“It is evident from the whole testimony that Hoelzel was walking; within two or three feet of the up-town rail of the Traction Company’s down-town track. When he reached the plank walk leading to his house the car was within fifteen feet behind him. The motorman saw him, but he did not see or hear the car, being slightly deaf or absent-minded. He then turned to his right to go across to the plank walk to his home, stepped upon the track and was instantly killed. When he stepped upon the track it was too late for the motorman to stop his car, if he had tried so to do, as he testified.
“ The court is of the opinion that the defendant was grossly negligent in its motorman running in that square at so fast a speed with a dim headlight without sounding his gong, and in not seeing the deceased in time to give him timely warning, and that the gross carelessness of the defendant company was the true cause of the accident.
“ The court is of the opinion, from the facts above stated, that the deceased was not guilty of contributory negligence. He had a right to walk to his home on the neutral ground and across the track. Where fifty to one hundred people daily for four or five years use a railway track for foot travel with the acquiescence of a railroad company, without their objection, such acquiescence creates a right which imposes on the company a duty of ordinary diligence to avoid injury to persons so using the track. The deceased simply did what he and his neighbors had been in the habit of doing for years, to the knowledge, without objection, and with the acquiescence of the company.”
Having gone over the the testimony in the record, I feel satisfied of the correctness of the statement of my learned brother of the District Court, but am of opinion that some additional extracts therefrom would somewhat fortify the facts stated by him, and I append the following:
First, in respect to the speed of the car, the failure of the motorman to sound the gong in the vicinity of the accident, and the dimness of the headlight.
The statement of a witness who was standing at a street corner-near by, waiting for a car, is, that he “ stood on the track and tried; *1311 to stop defendant’s car.” That “he stood on the rail of the track and tried to signal (the motorman) down, but it was impossible. He did not stop and (witness) then moved out of the way (so as) not to get knocked down. That the car was going at a very rapid rate of speed and there was hardly any headlight. The light was bad— there was hardly any light in the headlight. That the headlight was; so dim that the motorman could not see him, was the reason he did not stop his ear when he hailed him to do so — his headlight was not giving enough reflection.” That it was about 10 o’clock at night and. very dark.
The statement of one of the defendant’s witnesses — the only one introduced for the purpose of supporting the testimony of the motorman and the conductor — is, that at the time of the accident he was walking along the banquette on the opposite side of the avenue from the-residence of the deceased, in the same direction that the latter was-going, and about ten steps in his rear. That he saw the deceased! while he was talking with the watchman at the corner near by, and-, followed him when he started toward his home, as he wished to borrow a tool of some kind from him.
That he shouted to him “to look out, just as he stepped on the track? and the car hit him at the same time;” but he does not speak of hearing the gong sounded or of seeing the illumination of the headlight, notwithstanding his close proximity to the car. That he saw the car when it was about forty feet distant, but that “it did not take a minute — a half minute, it did not take that” — to overtake the deceased.
He states further that the deceased turned from the pathway between the two tracks to take the street-crossing to go to his home, just at the moment he shouted to him, and he was instantly struck by the car.
Second, as to circumstances attending the accident, illustrating the carelessness of the motorman in charge of the car, and the* speed oE the car.
A witness who resided just on the opposite side of the avenue-from the deceased and knew him well, states that he heard the report, and jumped up and ran across the street to the car.. That he spoke to the motorman, and he said in reply that he thought that he had killed a man; and it being dark he lighted a match and saw that the dead man was Hoelzel, who lived just on the opposite side of *1312 the street from the place of the accident. That he observed “ that the headlight was all bursted up, and that the fender in front of the car to protect it was bursted in half; that the skin and hair of Hoel-zel’s head were taken off, and it must have been done by the headlight.”
Another witness describes the scene thus:
“Well, I ran down and jumped the gutter, and when I got over there, Mr. Yokum was there, and the conductor, or motorman — one of them — said it was a negro that was lying on the track, sleeping; drunk, at least, it was. That Mr. Yokum said no, it is not; and he lighted a match, and said it is Mr. Hoelzel.”
He also stated that the headlight was bursted and the cowcatcher “broken. That Mr. Yokum raised the body up off of the track, his head facing toward the river and his body lying across the track of the defendant; about the centre, just opposite the plank walk leading to his house.
Another witness who resided in the vicinity of the accident said:
“ Well, as soon as he could jump across the gutter he ran across •the avenue to where the deceased was. That he was sitting on his gallery step at the time and heard the crash, and got up and jumped across and ran into the street * * *
“ When he got there he could not tell what it was, it was so dark. That he saw it was a dark object, but did not know whether it was a human being or not; when some one struck a match and pulled the Lead up, and he then recognized Mr. Hoelzel.”
He stated that he observed that the distance between the deceased .■and the car was apparently about forty feet, and the headlight was broken and the fender also.
Another witness testifies that when he arrived at the place of the accident he spoke to the motorman about it, and he said that it was impossible for him stop the car; that he thought he had killed a man; that he thought he saw a man on the track, but he did not know.
Another witness says that she was engaged in sewing while waiting for her husband, “ when she heard a car coming along at a frightful rate of speed, then all of a sudden, when it got in the middle of the block, she heard a crash, and got up and ran out and across the track and ran down to Mr. Hoelzel in front of his door.”
The statement of the motorman is that the night was a very dark *1313 one, but, aided by his headlight, he “ discovered an object * * and as he was nearing it, he could see that it was a man on the left, between the Illinois Oentral belt and the traction company’s electric line, walking on the outside. That the first thing that entered his mind was, knowing it was a man, of course he would keep out of the way of - the car; and as he approached him he kept right near the line of the car. That he could see he was in danger from where he was, and sounded the gong and hallowed to him at the same time. That he stepped immediately in front of the car to the right of witness, when the car struck him. That when he shouted to him, the ■deceased was within ten feet of the car. That as soon as he discovered what he had done, he just threw up his hands and said ‘ My God, what have I done,’ and ran back through the car to the conductor and said, ‘ Look out, I believe I have killed a man.’ ”
He further states, that when he -first saw there was an object on the side of the track, “ he could just tell there was an object movingand that after seeing the moving object, he supposes the car ran about forty feet, and the man kept right ahead of the car. That when the car had approached near enough for him to hail Hoelzel and say “ Look out,” he stepped in front of the ear and upon the track.
The statement of the conductor is as follows, viz.:
“ Well, we were running along there about the usual rate of speed, when he heard a crash, all of a sudden, in front of the car, and he started through the car and asked the motorman what was the matter; and when he was about one-third through the car, the motorman turned to him and threw up his hands and said, My God; I believe I have killed a man. ’ Just that way, and with that the car -stopped, and he ran back on the traek when he saw the man lying between the rails,” etc.
But the conductor did not confirm the statement of the motorman, to the effect that he sounded his gong near the place of the accident; nor that he shouted or hailed the deceased. Nor did he state that he sounded his gong, even at the adjacent street corner, though he does say that his supposition was that he did. He admits that the fender and headlight were broken in their contact with the deceased.
The best proof that no gong was sounded at or near the scene of the accident is furnished by the replies which the motorman made to the interrogatories that were propounded to him at the time, on *1314 the spur of the moment, and the voluntary statement he made to the-conductor at the instant the crash occurred.
And the further fact that, after the accident, the car was found to have passed some forty feet beyond the place of contact; and had the deceased been plainly visible by the aid of a good headlight, he should have been readily seen for a distance of seventy feet in front of the car, so that the car could have been stopped in time to have saved the life of the deceased.
And the further important fact is,- that the car was moving with such frightful rapidity that its contact with the deceased produced a crash that was plainly heard by and arrested the attention of more than a half dozen of the witnesses, who instantly rushed to the scene; and the violence of the shock was so great that it caused the-instant death of a strong man, broke down the fender, and shattered the headlight of the car.
Had the deceased, under the circumstances, looked — as, possibly, he did — just before making the attempt to step across the street car track, of not more than three feet in width, to see if a car was' approaching, his reasonable belief must have been that there was no-danger, as the gong had not been sounded, and the headlight was not sufficiently bright to indicate a dangerous proximity of the ear, and no means were afforded him of judging of the speed of the ear, which was,, in fact, so rapidly approaehing him.
In any view that can be taken of the testimony, the gross and culpable negligence of the motorman is manifest; and to say that an electric car can be run on a street of this city at such a frightful rate of speed, as the testimony discloses that of the defendant was moving when it ran over and killed Hoeizel, that dark night in April, without giving him any warning by the sound of the gong or aid of headlight, and the corporation be exonerated from liability, is, in my opinion, to place the lives and limbs of its inhabitants in imminent peril, and leave those who are dependent upon them for society and support without any security whatever.
The deceased was not upon the defendant's track, but he was traveling a plain, beaten path, that lies between it and that of the Illinois Central Railroad Company, and which had been in common use for years by the people of the neighborhood; and he was attempting to step across the track of the defendant in the effort to reach his home, when he was run over by defendant’s car and instantly killed.
*1315 • The deceased had an equal right to use this pathway as a means of ingress to and egress from his house, as any citizen to traverse any of the banquettes of the city; and is quite as much entitled to the protection of the law in the prudent exercise of that right.
In my opinion there was gross carelessness on the part of the defendant and no contributory fault on the part of the deceased.
I do not think the facts of this case bring it within the scope of Snider vs. Railroad Company, 48 An. 1; nor of McLaughlin vs. Railroad Co., 48 An. 23; nor of Settoon vs. Railway Company, 48 An. 807.
In the first case the plaintiff attempted, in open daylight, to drive his wagon across the defendant’s track on St. Charles avenue in front of an approaching car, and was run into and injured thereby. In the second, plaintiff’s little son was proceeding out Melpomene street driving a hoop with a stick, and while attempting to cross the defendant’s track on St. Oharles avenue was struck and injured by one of its cars. In the third case, plaintiff’s son was killed by a bos ear of the defendant while a train was being made up at the station— the boy in attempting to cross the track at night suddenly came in contact with a pole which was used in coupling cars.
The foregoing cases are cited in defendant’s brief, and it also refers to the following eases as being conclusively in its favor.
In Childs vs. Railroad Company, 33 An. 154, the plaintiff was held to have contributed to his injury by “ either misunderstanding or not heeding the warning that was given him.”
In White vs. Railroad Company, 42 An. 991, a lady was driviug in a buggy with three young children through a street in Shreveport in open daylight, and notwithstanding the whistle was blown and the bell rung a warning signal she drove so close to the train that her horse became frightened, ran away and upset the vehicle, whereby she was injured.
In Herlisch vs. Railroad Company, 44 An. 280, the plaintiff was struck and injured by a switch engine of the defendant, which was slowly moving at a point in its yard a short distance from the street crossing in the vicinity of an electric light — he having failed to either look or listen, and the bell was rung and the whistle sounded.
In Stanton vs. Garvey, 44 An. 519, the injured lady was hard of hearing, wore a large sun-bonnet which covered both sides of her face, when she was knocked down by a horse car and had her ankle *1316 broken by the car wheel that passed over it; but this accident occurred at a street crossing in open daylight, when, with proper care, she could have protected herself with ease.
In Schexnaydre vs. Railroad Company, 46 An. 248, the plaintiff’s son, who was a deaf mute, was walking on the defendant’s track with his back to an approaching train; but the day was clear and bright and the usual signals were given. The engineer was not aware of his infirmity, and, consequently, approached the boy too closely to be able to stop the train — assuming that he had heard the warning and would get off the track.
In Blackwell vs. Railroad Company, 47 An. 268, the plaintiffs were shown to have received injuries by the defendant’s train while riding in a wagon and attempting to cross the track ahead of same, notwithstanding it was in open view in broad daylight — though there were some- buildings which partially intervened.
In Smith vs. Railroad Company, 47 An. 833, the plaintiff received injuries by a horse car running over and breaking his leg, while he was walking on the track in front of same as it was approaching him from the rear; but his inattention to the approaching ear was held to have been inexcusable negligence, especially as he had just parted with a friend at the corner near by, Who was waiting for the car to carry him home.
Per contra, the plaintiff’s counsel cite the following cases, viz.:
In McGuire vs. Railroad Company, 46 An. 1543, after a careful examination and analysis of authority we held that in an action for damages against a railroad company by the surviving parents for the loss of their son who was run over and killed by the locomotive, the defence of contributory negligence will not avail if by the exercise of reasonable care on the part of those in charge of the train the accident might have been avoided.
This doctrine is also announced in 1 Thompson on Negligence, 1105, and Patterson’s Railway Accident Law, 51 and 55; Pierce on Railroads, 330.
The court in its opinion say in the McGuire case:
“But it is in proof that the signal for the brakes was not given nor any whistle sounded to announce the approaching train until the •deceased was almost under the wheels of the locomotive and his death inevitable. The engineer said he saw an object, but very close, and <could not tell what it was,” etc.
*1317 That case presents quite a striking likeness to the instant ease and involves an exactly similar principle, in my opinion.
“ It is the duty,” says the author, “ of a driver of a street car not only to see that the track is clear, but to exercise a constant watchfulness for persons who may he approaching the track.” 1 Thompson on Negligence, 898; Barnes vs. Railroad Company, 47 An. 1218.
In Gallagher vs. Railroad Company, 37 An. 288, it was correctly held “ that a car driver can be justly charged with negligence only when he fails to observe or do something he ought to have seen or done, and would notice or do with ordinary diligence; when he fails to be prepared for something visible, or at least of probable occurrence, or that might be reasonably expected of him.”
In this case the evidence clearly shows that the motorman of the defendant’s ear did not discharge his duty, but, on the contrary, was negligent in the sense of the rule announced in that opinion.
In Curley vs. Railroad Company, 40 An. 810, we said, a railroad company running and operating its road through the streets of a populous city is bound to observe extraordinary precautions for the safety of the public, particularly at street crossings.
In Johnson vs. Railroad Company, 56 N. W. Rep. 161, the Wisconsin court held, that as it appeared from the evidence “ that persons were accustomed to walk on the track, and that this had been done to such an extent that between the rails near where the plaintiff was injured there was a path worn by pedestrians, while the ground on either side was so incumbered as to make it inconvenient to walk outside the track,” both the. question (1) of whether the defendant had licensed the public to walk on its track, or had acquiesced in such use of it; (2) whether the defendant was guilty of negligence in the method of moving its train in repects to the plaintiff were for the jury to determine.
Accepting that ruling as correct, in my opinion it applies to the instant ease with far greater force, (1) because the pathway Hoelzel used'was not on the defendant’s track, but parallel with it; (2) the case was decided by the judge of the lower court and not by a jury.
In Kreis vs. Railroad Company, 83 S W. Rep. 64, the Missouri court held that the proof disclosing that the plaintiff’s wife, in “going to the depot, walked in the space on a double-tracked railroad, between the two tracks with an umbrella over her head, so near one of the tracks as to be struck by a train coming back of her, *1318 ■ does not show such negligence on her part as to justify the taking of the case from the jury — there being evidence that those in charge of the train knew that people were in the habit of walking between the ■tracks at that point, and that they did not use proper means to prevent the accident after they saw, or by ordinary care should have seen .her peril. (My italics.)
That decision seems to present an exactly parallel case to the one under consideration.
In Railway Company vs. Watkins, 26 S. W. Rep. 760, the Texas court held (1) that ‘‘when a railroad company has notice that a large number of pedestrians use its tracks at a particular place, and takes no steps to prevent this use, it is negligence for its train to .approach such place without giving warning; (2) that when a person 'walking along a railroad track, at a point where a great number of persons were accustomed to walk with the acquiescence of the company, is so startled by suddenly seeing a train which had approached from the rear to within a few feet of her without warning, that she jumps in front of it, she will not be held guilty of contributory negligence.” (My italics.)
But an even stronger case is stated than either of the foregoing, in Chamberlain vs. Railroad Company, 33 S. W. Rep. 437, in which the Missouri court held, that “ where a train is running through a populous neighborhood just outside the city limits, where laborers have for years been accustomed to use the tracks in going to their work, and the employees on the train see, or, by the exercise of ordinary care may see, a person on the track in time to avoid a collision, 'but fail to use such care, the company will be liable, though the person iinjured is guilty of contributory negligence.” (My italics.)
In Roth vs. Union Depot Company, 43 Pacific Rep. 641, the Washington court held, that “ where fifty to one hundred people, daily, for four or five years, use a railway track for foot travel, with the acquiescence of the railroad company, such acquiescence creates a right, which imposes on the company a duty of ordinary diligence to avoid injury to persons so using the track.” (My italics.)
It is upon the opinion in this last case that our learned brother of the lower court chiefly relied for the clear and sagacious statement he made of the plaintiff’s case; aided, it is true, by the opinions of this court in pari materia.
A careful examination of the law and evidence applicable to this *1319 •ease has convinced me that the liability of the defendant is clearly made out, and that deceased was without contributory fault. The judgment of the lower court should be affirmed.
For these reasons I dissent from the opinion of the majority of the .court.